# United States Court of Appeals
## For the Eighth Circuit

_____

No. 12-1427
_____

United States of America

*Plaintiff - Appellee*

v.

Jovica Petrovic, also known as Joshua Petrovic

*Defendant - Appellant*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: September 21, 2012
Filed: December 13, 2012
_____

Before RILEY, Chief Judge, SMITH and COLLOTON, Circuit Judges.
_____

RILEY, Chief Judge.

Jovica Petrovic was convicted of four counts of interstate stalking and two counts of interstate extortionate threat. The district court[1] sentenced Petrovic to ninety-six months imprisonment. Petrovic appeals his convictions and sentence,

_____

[1]The Honorable Henry E. Autrey, United States District Judge for the Eastern District of Missouri.

challenging the district court's (1) denial of his motion to dismiss the four stalking charges on First Amendment grounds, (2) denial of his motion for a mistrial, (3) jury instructions relating to one extortionate threat charge, and (4) two-level sentence enhancement for obstruction of justice. Petrovic also contests the sufficiency of the evidence to convict him of all charges. We affirm.

## I.    BACKGROUND
### A.    Facts

Petrovic and the victim, M.B., began a relationship in 2006, married in 2009, and later divorced. During their relationship, Petrovic resided in Florida and M.B. resided in Missouri, where she and her ex-husband, R.B., shared custody of their two young children. Petrovic and M.B. often met in Florida or Missouri, and M.B. occasionally allowed Petrovic to take pictures of her in the nude or performing various sex acts. M.B. also confided in Petrovic, revealing private and intimate information in text messages, such as the sexual abuse M.B. suffered as a young girl, her suicidal thoughts and tendencies, family secrets, and self-doubts about her fitness as a mother. Petrovic saved thousands of these text messages.

During their relationship, Petrovic also accumulated other potentially embarrassing information about M.B. In July 2009, M.B. attempted suicide at Petrovic's home after finding evidence leading her to believe Petrovic was having an extra-marital affair. After M.B. was taken to the hospital for treatment, Petrovic took pictures of the pool of blood that had formed on the floor. In December 2009, Petrovic took several trips to Missouri to see M.B. During these trips, Petrovic stayed at a local hotel and secretly filmed M.B. having sexual intercourse with him. Petrovic took steps to ensure that M.B. was identifiable in the videos. He refused to turn off the lights, removed the sheets from the bed, and directed M.B.'s face and exposed genitalia toward the concealed camera.

On December 28, 2009, M.B. informed Petrovic by text message that she was ending their relationship. In response, Petrovic sent M.B. text messages informing her that he had secretly recorded their recent sexual encounters and had saved all of the text messages M.B. previously sent him. Petrovic threatened to post this information on the internet so M.B.'s family could read the messages and see the videos, if M.B. did not continue their relationship. Petrovic stated he was not "blackmail[ing]" M.B. and was only saving the information for his own "protection," but told M.B. to "be smart." Petrovic informed M.B. she and her family could soon visit his new website, "www.[M.B.]slut.com." M.B. understood Petrovic intended to "ruin [her] life" if she did not "get back together with [Petrovic]," but M.B. nevertheless permanently ended the relationship.

Petrovic then began a campaign to carry out his threats. Over the course of the next few months, Petrovic mailed dozens of homemade postcards to addresses throughout M.B.'s community, including to M.B.'s workplace, M.B.'s family members, R.B.'s home, and local businesses like the neighborhood drugstore. The postcards typically portrayed a picture of a scantily clad M.B. along with abusive language (for example, "I am just a whore 4 sale") and directions to a website, "www.marriedto[M.B.].com." The postcards were viewed by M.B.'s children, other family members, and many acquaintances. News of the website spread throughout the community, and almost everyone M.B. knew became aware of the site.

The website was publicly accessible in March 2010. Petrovic reported his site was "huge," containing "20,000 or 30,000 pages" of material reflecting months of preparation by Petrovic, who began creating the site in August 2009. The site contained links to dozens of images of M.B. posing in the nude or engaging in sex acts with Petrovic, and included many from the tapes Petrovic secretly recorded. Visitors to the site could view scores of pictures of M.B.'s children and other family members by clicking on a link next to the pornographic material. Several photographs of M.B. performing a sex act with Petrovic were repeatedly and prominently displayed

throughout the website, including on the site's home page. Petrovic also posted thousands of pages of the text messages M.B. had sent him. The messages were color-coded by speaker and organized chronologically, with the most private and embarrassing messages given special pages to increase readership. Petrovic posted the pictures of the blood from M.B.'s suicide attempt, further highlighting her suicidal thoughts and history. Private information about M.B. and her family was also revealed, including M.B.'s contact information and the social security numbers of her children. M.B. did not authorize Petrovic to release any of this information. After learning of the website, M.B. "had a breakdown" and "wanted to die."

Besides the website and postcards, Petrovic sent several packages containing enlarged photographs of M.B. engaging in various sex acts with Petrovic to M.B. at her work, to M.B.'s boss, to M.B.'s family members, and to R.B.'s home, where M.B.'s seven-year-old child viewed the pornographic material. Petrovic also repeatedly made harassing phone calls to M.B's workplace, and physically intimidated M.B. on several occasions—on one such occasion, pursuing M.B. in a rental van at a high rate of speed while M.B. was on her way home from work.

In June 2010, M.B.'s sister was able to have Petrovic's website shut down for a few days. On June 20, 2010, Petrovic relaunched the site and posted a message stating, "Nobody can stop me to publish this website" and offering to shut down the site if M.B. gave him his "furniture, what she stoled [sic] from me, the wedding and engagement ring, . . . and $100,000." M.B. did not comply with Petrovic's demands, and the website remained operational. On July 19, 2010, Petrovic was arrested by United States Postal Inspectors.

### B. Procedural History

On October 6, 2010, a grand jury indicted Petrovic with, among other charges, four counts of interstate stalking, in violation of 18 U.S.C. § 2261A(2)(A), and two counts of interstate extortionate threat, in violation of 18 U.S.C. § 875(d). Petrovic

moved to dismiss the four stalking charges on the grounds the statute violated the First Amendment both facially and as applied to Petrovic. The district court denied this motion.

At trial, the district court denied Petrovic's motion for a mistrial after a government witness, a local municipal judge named Patrick Coyne, testified he had viewed the website and telephoned R.B. because Coyne thought Petrovic's conduct "look[ed] criminal." The district court also approved, over Petrovic's objection, the government's proposed jury instruction stating a "sexual relationship" could constitute a "thing of value" one can intend to extort for purposes of conviction under § 875(d). The jury convicted Petrovic on four counts of interstate stalking and two counts of interstate extortionate threat. At sentencing, the district court applied a two-level sentence enhancement for obstruction of justice based on Petrovic's perjury at trial under United States Sentencing Guidelines (U.S.S.G.) § 3C1.1. Petrovic appeals.

## II. DISCUSSION
### A. First Amendment

Petrovic first argues 18 U.S.C. § 2261A(2)(A)[2], the interstate stalking statute, violates his right to freedom of speech under the First Amendment to the United States Constitution. Petrovic contends the statute is unconstitutional both facially and as applied to him. We review First Amendment challenges de novo. See United States v. Beale, 620 F.3d 856, 865 (8th Cir. 2010).

---

[2]"Whoever . . . with the intent . . . to . . . injure, harass, or place under surveillance with intent to . . . injure, harass, or intimidate, or cause substantial emotional distress to a person in another State . . . uses the mail, any interactive computer service, or any facility of interstate or foreign commerce to engage in a course of conduct that causes substantial emotional distress to that person or places that person in reasonable fear of . . . serious bodily injury . . . shall be punished as provided in section 2261(b) of this title."

### 1. As Applied Challenge

"[W]hen 'speech' and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms." United States v. O'Brien, 391 U.S. 367, 376 (1968). A governmental regulation satisfies this standard if (1) "it is within the constitutional power of the Government"; (2) "it furthers an important or substantial governmental interest"; (3) "the governmental interest is unrelated to the suppression of free expression"; and (4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." Id. at 377.

Petrovic contends § 2261A(2)(A) fails O'Brien's four-pronged test in his case. However, we need not reach the merits of the O'Brien test if, as a preliminary matter, we determine the communications for which Petrovic was convicted under the statute are not protected by the First Amendment. Cf. id. at 376. Because we hold Petrovic's communications fall outside the First Amendment's protection, we do not reach the merits of the O'Brien test.

The First Amendment provides "Congress shall make no law . . . abridging the freedom of speech." While it generally "means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content," Ashcroft v. A.C.L.U., 535 U.S. 564, 573 (2002) (quoting Bolger v. Youngs Drug Prods. Corp., 463 U.S. 60, 65 (1983)) (internal quotation marks omitted), certain "well-defined and narrowly limited classes of speech" permit content-based restrictions on speech, United States v. Stevens, 559 U.S. ___, ___, 130 S. Ct. 1577, 1584 (2010) (quoting Chaplinsky v. New Hampshire, 315 U.S. 568, 571-72 (1942)) (internal quotation marks omitted). One such category is "speech integral to criminal conduct." Id.; see also Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498 (1949).

The jury convicted Petrovic of two counts of interstate extortionate threat in violation of 18 U.S.C. § 875(d) for his December 28, 2009 and June 20, 2010 communications.[3]  The communications for which Petrovic was convicted under § 2261A(2)(A) were integral to this criminal conduct as they constituted the means of carrying out his extortionate threats.  See Giboney, 336 U.S. at 498, 501-02 (enjoining otherwise lawful picketing activities did not offend the First Amendment when the purpose of the picketing was to compel a company to unlawfully enter into an agreement in restraint of trade).  Petrovic threatened to destroy M.B.'s reputation if she terminated their sexual relationship.  When M.B. ended the relationship, Petrovic carried out this threat.  Petrovic also threatened to continue the humiliating communications unless M.B. paid him $100,000, and when M.B. did not comply, Petrovic carried out this threat for continuing harassment as well.  Because Petrovic's harassing and distressing communications were integral to his criminal conduct of extortion under § 875(d), the communications were not protected by the First Amendment.

Furthermore, "where matters of purely private significance are at issue, First Amendment protections are often less rigorous . . . because restricting speech on purely private matters does not implicate the same constitutional concerns as limiting speech on matters of public interest."  Snyder v. Phelps, 562 U.S. ___, ___, 131 S. Ct. 1207, 1215 (2011); see also Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 758-60 (1985).  We previously have held that in "extreme case[s]" it is "constitutionally permissible for a governmental entity to regulate the public disclosure of facts about private individuals."  Coplin v. Fairfield Pub. Access

_____

[3]Petrovic does not similarly contest the constitutionality of § 875(d) either facially or as applied to him, presumably because it is well established that extortionate threats may be proscribed consistent with the First Amendment. See, e.g., Gresham v. Peterson, 225 F.3d 899, 908-09 (7th Cir. 2000); United States v. Quinn, 514 F.2d 1250, 1268 (5th Cir. 1975).

Television Comm., 111 F.3d 1395, 1404 (8th Cir. 1997). "[A]bsent a compelling state interest," such speech

> can be regulated . . . because of its constitutionally proscribable content only if: (1) any such regulation is viewpoint-neutral; (2) the facts revealed are not already in the public domain; (3) the facts revealed about the otherwise private individual are not a legitimate subject of public interest; and (4) the facts revealed are highly offensive.

Id. at 1405.

M.B. was a private individual, and Petrovic's communications revealed intensely private information about M.B. See id. at 1404-05. Applying the Coplin test, the interstate stalking statute is viewpoint neutral. It proscribes stalking and harassing conduct without making the further content discrimination of proscribing only certain forms of that conduct. See R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 384 (1992). Second, the intimately private facts and photographs revealed by Petrovic were never in the public domain before Petrovic began his campaign to humiliate M.B. Third, the public has no legitimate interest in the private sexual activities of M.B. or in the embarrassing facts revealed about her life. See Coplin, 111 F.3d at 1405. Finally, the information Petrovic publicized to the community was highly offensive. See id. The communications for which Petrovic was convicted under § 2261A(2)(A) may be proscribed consistent with the First Amendment. The statute is not unconstitutional as applied to Petrovic.

### 2. Facial Challenge

Petrovic also contends § 2261A(2)(A) is facially invalid. "In the First Amendment context . . . a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's

plainly legitimate sweep.'" Stevens, 559 U.S. at ___, 130 S. Ct. at 1587 (quoting Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 n.6 (2008)).

An overbreadth challenge like Petrovic's will "[r]arely . . . succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." Virginia v. Hicks, 539 U.S. 113, 124 (2003). Section 2261A(2)(A) is directed toward "course[s] of conduct," not speech, and the conduct it proscribes is not "necessarily associated with speech." Because the statute requires both malicious intent on the part of the defendant and substantial harm to the victim, see § 2261A(2)(A), "[i]t is difficult to imagine what constitutionally-protected . . . speech would fall under these statutory prohibitions. Most, if not all, of the[ statute's] legal applications are to conduct that is not protected by the First Amendment." United States v. Bowker, 372 F.3d 365, 379 (6th Cir. 2004), vacated on other grounds, 543 U.S. 1182 (2005). The rare application of the statute that offends the First Amendment "can still be remedied through as-applied litigation." Hicks, 539 U.S. at 124. Because a substantial number of the statute's applications will not be unconstitutional, we decline to use the "'strong medicine' of overbreadth to invalidate the entire [statute]." Id. (quoting Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973)); see also United States v. Cassidy, 814 F. Supp. 2d 574, 586 (D. Md. 2011) (holding § 2261A(2)(A) unconstitutional as applied when the defendant was convicted for speech directed towards a public figure, a leader of a religious sect).

## B. Denial of Motion for Mistrial

At trial, the government called Patrick Coyne to the stand, an attorney and local municipal judge. Coyne testified that, after viewing Petrovic's website, he called R.B. and offered to have a prosecutor friend look into the matter because the site "look[ed] criminal" to Coyne. Petrovic made a non-specific objection, which was sustained. The government then asked why Coyne had called R.B. Coyne testified he called R.B. "because [he] thought that the content was criminal." Shortly thereafter, Petrovic

moved for a mistrial, claiming Coyne's testimony constituted a legal opinion about Petrovic's guilt that was "fundamental[ly] unfair[]" because Coyne's status as a judge would carry much weight with the jury. The district court denied the motion, finding that Coyne's testimony was not "so onerous that a mistrial should be declared" and that a curative instruction would only "highlight the issue." The district court further explained the statement was not "so much his opinion as it is his basis for his next step or his next piece of conduct." The next day, the government offered to stipulate to a curative instruction, but Petrovic declined, stating to do so "would just draw attention to [Coyne's] testimony . . . regarding his belief that the conduct was criminal."

Petrovic contends the district court abused its discretion by failing to grant his motion for a mistrial. See United States v. Wallette, 686 F.3d 476, 482 (8th Cir. 2012) (standard of review). We express concern Coyne's comment may have carried substantial weight because of Coyne's status as a local lawyer and municipal judge, potentially prejudicing the jury. However, we note that "'less drastic measures [than mistrial] such as a cautionary instruction are generally sufficient to alleviate prejudice' stemming from accidental comments." United States v. Weaver, 554 F.3d 718, 724 (8th Cir. 2009) (quoting United States v. Urqhart, 469 F.3d 745, 749 (8th Cir. 2006)). Petrovic intentionally and voluntarily rejected the government's stipulation to a curative instruction, which could have remedied much of any prejudice resulting from Coyne's testimony. Petrovic thus waived his right to appeal the denial of his motion for a mistrial as to any prejudice that would have been cured by such an instruction. See United States v. Jones, 662 F.3d 1018, 1027 (8th Cir. 2011).

To the extent any prejudice from Coyne's testimony would not have been remedied by a curative instruction, any error by the district court in failing to grant a mistrial was harmless because the jury was presented with "'substantial evidence' of [Petrovic's] guilt." Weaver, 554 F.3d at 724 (quoting Urqhart, 469 F.3d at 749). Petrovic's trial lasted four days. Ten witnesses testified, including M.B., other victims, and Petrovic, who made numerous incriminating admissions on the stand.

The government also introduced into evidence over fifty exhibits containing, among other items, postcards Petrovic mailed and graphic images from the secret sex tapes Petrovic posted on the website. Because substantial—arguably overwhelming—evidence from a variety of sources, including Petrovic himself, supports Petrovic's guilt, any error in failing to grant a mistrial was harmless. See Urqhart, 469 F.3d at 749.

### C. "Sexual Relationship" as a "Thing of Value"

To be convicted under the interstate extortionate threat statute, Petrovic must have intended to extort from M.B. "any money or other thing of value."[4] 18 U.S.C. § 875(d). The district court instructed the jury, over Petrovic's objection, that a "sexual relationship" could constitute a "thing of value" under § 875(d). Petrovic maintains this was error that caused him to be improperly convicted of one charge of violating § 875(d) for his December 28, 2009 communications in which Petrovic threatened to harm M.B.'s reputation if she ended their relationship.[5] We typically review district courts' rulings concerning contested jury instructions for an abuse of discretion, and we reverse only when any error was prejudicial. See United States v. Yielding, 657 F.3d 688, 708 (8th Cir. 2011). However, when "[o]ur review requires statutory interpretation, [it is] an issue of law that we consider de novo." United States v. Haas,

---

[4]Section 875(d) states, "Whoever, with intent to extort from any person . . . any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee . . . shall be fined under this title or imprisoned not more than two years, or both."

[5]Petrovic does not similarly challenge his conviction for the second charge of violating § 875(d) for his June 20, 2010 communications in which he threatened to keep the website operational until M.B. returned described property and paid him $100,000, presumably because the described property and the $100,000 clearly constitutes "money or other thing of value" under the statute.

623 F.3d 1214, 1218 (8th Cir. 2010); see also United States v. Ho, 311 F.3d 589, 605 (5th Cir. 2002).

"Congress'[s] frequent use of 'thing of value' in various criminal statutes has evolved the phrase into a term of art which the courts generally construe to envelop[] both tangibles and intangibles." United States v. Nilsen, 967 F.2d 539, 542 (11th Cir. 1992). Petrovic concedes a "thing of value" under § 875(d) includes intangible objectives. Numerous intangible objectives have been held to constitute things of value under a variety of other statutes, including romantic pursuits and sex-related consideration. See United States v. Barraza, 655 F.3d 375, 383-84 (5th Cir. 2011) (sexual favors); United States v. Kulla, 434 F. App'x 268, 269 (4th Cir. 2011) (unpublished per curiam) ("the time and attention" of a younger woman with whom defendant "pursue[d] a romantic relationship"); United States v. Owens, 585 F.3d 1055, 1058 (7th Cir. 2009) (anticipation of future sexual encounters); United States v. Marmolejo, 89 F.3d 1185, 1191 (5th Cir. 1996) (conjugal visits); see also United States v. Girard, 601 F.2d 69, 71 (2d Cir. 1979) (listing precedents construing a "thing of value" to include amusement, sexual intercourse or the promise of sexual intercourse, a promise to reinstate an employee, an agreement not to run in a primary election, or the testimony of a witness). But see Chappell v. United States, 270 F.2d 274, 276-78 (9th Cir. 1959) (holding a "thing of value" under 18 U.S.C. § 641 does not extend to intangible items based on the statute's unique legislative history).

These holdings reflect the principle that value is a subjective, rather than objective, concept where "the focus of the . . . term is to be placed on the value which the defendant subjectively attaches" to what is sought to be received. United States v. Gorman, 807 F.2d 1299, 1305 (6th Cir. 1986); see also United States v. Williams, 705 F.2d 603, 622-23 (2d Cir. 1983). Although these cases differ in procedural postures and involve different statutes than does the present case, we see no reason why a "thing of value" under § 875(d) is more narrow than what the broad term of art encompasses in other contexts. A defendant can attach value to a "sexual

-12-

relationship" just as readily as to sexual intercourse or other sex-related considerations, and a "sexual relationship" may be an intangible "thing of value" one intends to extort under § 875(d).  The district court did not err by instructing the jury that a "sexual relationship" could be a "thing of value" under § 875(d).

### D.    Obstruction of Justice Enhancement

At trial, Petrovic made a number of implausible statements under oath, including that he did not intend to harm M.B. by engaging in his course of conduct and M.B. assisted him in creating the website.  At Petrovic's sentencing hearing, the district court applied a two-level sentence enhancement for obstruction of justice under U.S.S.G. § 3C1.1 after determining Petrovic committed perjury at trial.  See U.S.S.G. § 3C1.1, cmt. n.4(B).  Petrovic asserts the district court erred in enhancing his sentence by "rely[ing] solely on the findings contained in the Presentence Investigation Report" (PSR) in determining Petrovic committed perjury, thereby "reliev[ing] the government of its burden to prove by a preponderance of the evidence that . . . Petrovic obstructed justice."

"A witness testifying under oath" commits perjury when he "gives false testimony concerning a material matter with the willful intent to provide false testimony."  United States v. Dunnigan, 507 U.S. 87, 94 (1993), possibly abrogated on other grounds by United States v. Wells, 519 U.S. 482 (1997).  Because false testimony may instead be the result of "confusion, mistake, or faulty memory," district courts "must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice" before applying a sentence enhancement under U.S.S.G. § 3C1.1.  Id. at 95.  A district court must then decide by a preponderance of the evidence whether a defendant committed perjury for § 3C1.1 purposes.  See United States v. Stulock, 308 F.3d 922, 926 (8th Cir. 2002).  We review such a finding for clear error.  See id. at 925-26.

The district court made the requisite independent finding that Petrovic committed perjury, and the district court did not merely rubberstamp the PSR's conclusions and recommendations. Although the district court stated it was "accept[ing] the facts . . . set forth in the [PSR]" when it applied the § 3C1.1 enhancement, the district court did so only after (1) reviewing Petrovic's objections to the PSR and the government's brief highlighting instances of perjury at trial, (2) hearing arguments on the matter at the sentencing hearing, and (3) conducting a "full and complete review of the record and the matters set forth in the [PSR]." The district court also referred to certain testimony of Petrovic, stating "[i]t is inconceivable . . . and entirely not credible that [M.B.] . . . gave [Petrovic] permission to send lewd photographs to her family, her friends, her employer. . . . It's inconceivable . . . that [M.B.] allowed [Petrovic] to post statements about [M.B.], vile, vicious, despicable statements on the Internet." The district court based its finding of perjury on its own independent evaluation and not solely on the PSR.

### E.     Sufficiency of the Evidence

Petrovic finally argues the jury lacked sufficient evidence to convict him under 18 U.S.C. §§ 2261A(2)(A) and 875(d). "We review de novo sufficiency of the evidence challenges" and will uphold the jury's verdict "if there is an interpretation of the evidence that would allow a reasonable jury to find [Petrovic] guilty beyond a reasonable doubt." United States v. Lee, 687 F.3d 935, 940 (8th Cir. 2012) (internal citations and quotation marks omitted). "In making such an evaluation, 'it is axiomatic that we do not review questions involving the credibility of witnesses, but leave credibility questions to the jury.'" Id. (quoting United States v. Ragland, 555 F.3d 706, 715 (8th Cir. 2009)).

### 1.     18 U.S.C. § 2261A(2)(A)

Conviction under § 2261A(2)(A) requires a jury to find three basic elements beyond a reasonable doubt: (1) malicious intent by the defendant toward a victim in another jurisdiction; (2) a "course of conduct" making use of a facility of interstate

commerce; and (3) substantial harm to the victim.  See 18 U.S.C. § 2261A(2)(A).  Petrovic contends no reasonable jury could have found the first and third elements beyond a reasonable doubt based on the evidence adduced at trial.

With respect to the intent element, Petrovic alleges the evidence "did not prove that . . . Petrovic had any intention to harass [M.B.]" but instead only "showed an emotionally turbulent and disdainful marriage between . . . Petrovic and [M.B.]."  We disagree.  Ample evidence supported the jury's finding Petrovic intended to harass M.B. or cause M.B. substantial emotional distress, such as: (1) text messages in which Petrovic referenced the website and told M.B. to "[e]njoy [her] pain," and Petrovic wished M.B. a "painful and unhappy life," suggesting a "TANTRUM IN YOUR HEART," and a "TANTRUM ON YOUR SOUL"; (2) postcards sent by Petrovic to M.B.'s ex-husband, employer, family members, and local businesses referring readers to the website and displaying images of M.B. in sexually suggestive poses along with abusive language; and (3) the prominent disclosure of intensely intimate and private information about M.B. on the website, including the sexual abuse she suffered as a child and pictures of M.B. engaged in a variety of surreptitiously recorded sex acts.  Based on the evidence adduced at trial, the jury reasonably found Petrovic had the requisite intent required by § 2261A(2)(A).

Petrovic also proposes no reasonable jury could find M.B. suffered "substantial emotional distress" as a result of Petrovic's conduct.  See 18 U.S.C. § 2261A(2)(A).  He argues any emotional distress suffered by M.B. was not "conclusively tie[d]" to his conduct, but was instead caused by M.B.'s "long history of mental health problems."  At trial, M.B. testified, as a result of Petrovic's conduct, she "had a breakdown," "fe[lt] like somebody [had] rip[ped her] entire inside out of [her]" which "was the worst feeling in [her] life," became estranged from family members, and was depressed and contemplated suicide.  M.B.'s sister, former employer, and ex-husband all testified about the severe emotional toll Petrovic's actions took on M.B.  The jury

-15-

reasonably found M.B. suffered substantial emotional distress caused by Petrovic's conduct rather than any pre-existing mental health issues.

### 2. 18 U.S.C. § 875(d)

Petrovic suggests "[t]he evidence adduced at trial did not prove that . . . Petrovic acted at any point in time with the intent to extort a thing of value" to be convicted under § 875(d). Because "a sexual relationship is not a thing that can be assigned value," Petrovic argues, "the government did not prove beyond a reasonable doubt that . . . Petrovic intended to extort a thing of value." This argument merely restates Petrovic's objections to a "sexual relationship" being a "thing of value" under § 875(d)—objections which we have already rejected. Petrovic does not challenge the sufficiency of the evidence showing intent or any other element under § 875(d). See Jasperson v. Purolator Courier Corp., 765 F.2d 736, 740-41 (8th Cir. 1985) ("A party's failure to raise or discuss an issue in his brief is to be deemed an abandonment of that issue.").

## III. CONCLUSION

We affirm.

_____

-16-