******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

## STATE OF CONNECTICUT *v.* BLAIR BILLINGS
## (AC 44149)

Alvord, Elgo and Clark, Js.

*Syllabus*

Convicted of criminal violation of a restraining order, stalking in the second degree and harassment in the second degree, the defendant appealed to this court. The defendant had been in a relationship with A, and, when A ended the relationship, the defendant began posting photographs of her and private details about their affair on social media. A obtained an ex parte restraining order against the defendant, and, a few days after he was served with it, the defendant had a conversation with a third party on his Facebook page relating to the affair. The defendant did not refer to A by name in this conversation, but he referenced A's workplace, details of the affair, his alleged evidence of the same, and his desire to tell A's husband about the affair. A's friend, W, took screenshots of the conversation and sent them to A. On the sole basis of that Facebook conversation, the state charged the defendant. At trial, the state admitted into evidence the screenshots of the Facebook conversation, along with screenshots of posts and messages relating to A and the affair from various other social media accounts that allegedly belonged to the defendant. *Held*:

1. The trial court did not abuse its discretion when it admitted into evidence screenshots of the social media posts and messages attributed to the defendant because the screenshots were properly authenticated: the screenshots were admitted through W and A, who both testified that they knew the defendant and that they were able to directly link the defendant to the posts and messages in the screenshots on the basis of the content and distinctive characteristics of the posts, messages, and social media accounts, despite that the majority of the posts and messages were not directly received or authored by W or A; moreover, the state was not required to conclusively prove that the defendant wrote and published the posts and messages, and concerns that the social media accounts associated with the defendant were either fake or hacked and concerns regarding the irregularity of the date stamps on the screenshots were not enough to bar their authentication, as such concerns went to the weight of the evidence, not its admissibility.

2. This court concluded that the applicable criminal statutes (§§ 53a-181d and 53a-183) for stalking in the second degree and harassment in the second degree, respectively, as applied to the defendant, violated his rights under the first amendment and, accordingly, reversed the judgment with respect to his conviction of stalking in the second degree and harassment in the second degree:

   a. The state's claim that, although the defendant's Facebook conversation did not fall into the unprotected categories of speech of true threats, fighting words or obscenity, the speech in question was unprotected because it fell within the speech integral to criminal conduct exception to the first amendment was unavailing, as the defendant's actions of logging into his Facebook account and posting on his own page did not constitute nonspeech conduct for purposes of the exception, rather, those actions constituted the means by which he spoke, such that the defendant's posts contained in the Facebook conversation were not integral to the criminal conduct but, instead, were the criminal conduct; moreover, because the defendant's conviction was based solely on the Facebook conversation, in the absence of that protected speech, there was insufficient evidence to sustain the defendant's conviction under § 53a-181d.

   b. The state could not prevail on its claim that the Facebook conversation consisted of speech and nonspeech elements and that, under the test set forth in *United States* v. *O'Brien* (391 U.S. 367), the government had a sufficient interest in regulating the nonspeech element to justify the incidental limitations on the defendant's first amendment freedoms, as the Facebook conversation consisted solely of speech; moreover, the state did not argue that the speech was unprotected under any exception

to the first amendment, and our Supreme Court's decision in *State* v. *Moulton* (310 Conn. 337), made clear that the reach of § 53a-183 was limited to speech that was not protected by the first amendment; furthermore, because the defendant's conviction was based solely on the Facebook conversation, in the absence of that protected speech, there was insufficient evidence to sustain the defendant's conviction under § 53a-183.

3. Contrary to the defendant's claim, he was not deprived of his due process right to a fair trial as a result of alleged prosecutorial improprieties:

a. The state's violations of discovery orders did not constitute prosecutorial improprieties and the trial court did not abuse its discretion in fashioning its remedies for the state's noncompliance: there was no indication that the state's disclosure of additional discovery on the eve of jury selection was done in bad faith, as the state turned over the information shortly after it had come to its attention, and the trial court did not abuse its discretion in failing to impose a severe sanction on the state for its late disclosure because it granted defense counsel's request for a recess to review the new discovery and then granted his motion for a continuance, which sufficiently protected the defendant's rights by ameliorating any prejudice caused by the late disclosure; moreover, the trial court did not abuse its discretion when it declined to preclude W from testifying as a result of the state's failure to provide the defendant with W's criminal history and address because it determined that such a severe sanction was inappropriate, given the minimal prejudice caused by the state's noncompliance; furthermore, the trial court did not abuse its discretion when it failed to grant a mistrial after the state attempted to offer a statement of a party opponent at trial without previously disclosing such statement to the defendant because the court's ruling precluding the admission of the statement as evidence clearly ameliorated any prejudice stemming from the state's late disclosure of the statement.

b. The defendant could not prevail on his claims that the prosecutor committed prosecutorial impropriety during his closing argument: the prosecutor's use of the term "red herring" in his closing argument was intended to rebut a portion of the defendant's theory of defense, specifically, that A was not credible, and was not directed at defense counsel's character or credibility and did not impugn or disparage him; moreover, the prosecutor's statement that it would have taken effort for the defendant to get to A's home was permissible because it properly referred to facts in evidence, namely, that A lived in a rural area and that the defendant's primary mode of transportation was a bicycle, and then invited the jury to draw a reasonable inference based on those facts.

Argued May 11—officially released December 20, 2022

*Procedural History*

Substitute information charging the defendant with the crimes of criminal violation of a restraining order, stalking in the second degree, and harassment in the second degree, brought to the Superior Court in the judicial district of Windham, geographical area number eleven, and tried to the jury before *Spellman, J.*; verdict and judgment of guilty, from which the defendant appealed to this court. *Reversed in part*; *judgment directed.*

*James B. Streeto*, senior assistant public defender, with whom, on the brief, was *Alison L. Fonseca*, certified legal intern, for the appellant (defendant).

*Meryl R. Gersz*, deputy assistant state's attorney, with whom, on the brief, were *Anne F. Mahoney*, state's attorney, and *Andrew Slitt* and *Jennifer Barry*, assistant state's attorneys, for the appellee (state).

*Opinion*

CLARK, J. The defendant, Blair Billings, appeals from the judgment of conviction, rendered after a jury trial, of criminal violation of a restraining order in violation of General Statutes § 53a-223b (a) (2), stalking in the second degree in violation of General Statutes (Supp. 2018) § 53a-181d (b) (1),[1] and harassment in the second degree in violation of General Statutes (Rev. to 2017) § 53a-183 (a) (2).[2] On appeal, the defendant claims that (1) the court abused its discretion by admitting into evidence social media posts and messages that the state failed to properly authenticate, (2) the state committed prosecutorial impropriety by failing to comply with certain discovery requirements and by making improper statements during its closing arguments, (3) the court abused its discretion when it declined to sanction the state for violating a court order regarding discovery, and (4) the evidence was insufficient to sustain his convictions for stalking and harassment because they were predicated on speech protected by the first amendment.[3] Because we agree with the defendant with respect to his first amendment claim, we reverse the judgment of conviction of harassment in the second degree and stalking in the second degree. The judgment is affirmed in all other respects.

The following facts, which reasonably could have been found by the jury, and procedural history inform our review of the defendant's claims. The victim, A,[4] lived in Putnam with her husband and worked as a karate instructor at a karate school in Danielson (karate school). She and her husband have six children, some of whom, at the time of the trial, still lived at home. In September, 2017, A attended a party hosted by the owner of the karate school. At the party, A met the defendant for the first time and the two "hit it off." Later that evening, the two talked by themselves "for quite a while just about a lot of personal stuff and general stuff, things."

While at the party, A and the defendant added one another as friends on Facebook. A few days later, A messaged the defendant on the platform. The two also started following each other on Instagram. Over the next few weeks, A and the defendant began communicating frequently and eventually met for drinks. Thereafter, their relationship "became more personal" and A eventually told the defendant that she "wanted to have a relationship, an affair" with him. In early November, 2017, A and the defendant's relationship turned physical and the two began having sexual intercourse and also exchanged intimate photographs of each other. During that same time, A encouraged the defendant to become a student at the karate school, which he did.

In either December, 2017, or January, 2018, A ended the relationship. The defendant became "angry and

combative," which "terrified" A. Despite ending the relationship, A continued to communicate with the defendant on a daily basis, stating that she "was trying to calm him down and be amicable" because they were adults. She also met with him at a laundromat to give him a set of nunchucks[5] with which he could practice his karate.[6] A then saw the defendant one final time at an event at the karate school.

In February, 2018, A unfriended the defendant on Facebook, which left him unable to see her Facebook page or to message her on that platform. The defendant then began messaging her on Instagram, where the two still followed each other. Thereafter, the defendant resorted to posting photographs of A and private details about their affair and about members of her family on social media.

In light of the defendant's actions, A obtained an ex parte restraining order against the defendant on April 2, 2018, which was served on the defendant on April 3, 2018. Importantly, for purposes of this appeal, the defendant's conduct prior to the issuance of the restraining order does not form the basis of any of the defendant's convictions.

On or about April 7, 2018, a few days after the defendant was served with the ex parte restraining order, James Walters, a friend of A, sent A screenshots of a Facebook conversation that the defendant had on his own Facebook page with Tracey Hart Field, another Facebook user unknown to A (April 7, 2018 Facebook conversation). A previously had asked Walters to monitor several of the defendant's social media accounts. Walters checked the defendant's accounts frequently for posts that might interest A, took screenshots of them, and sent the screenshots to A. The screenshots of the April 7, 2018 Facebook conversation read as follows:[7]

"[The Defendant]: I have enough text messages and photos to ruin another human being life. And even more lives. What do I do?"

"[The Defendant]: No one ever cut me slack!!! They just used anything I said against me now It's my turn!. Thanks for the impute."

"[Hart Field]: I would need to know what it's about to answer."[8]

"[The Defendant]: She told me 'targeting her was a very bad idea' I've [since] retrieved that message. She has a lot to lose! I've even taken bedding with her DNA all over it and handed [it] over to a[n] attorney in Maine with all the proof and details."

"[Hart Field]: . . and, of course, you know I'm gonna be 'captain obvious' and now say that being involved with a married person is wrong . . you're a good guy and better than that. ♥."

"[The Defendant]: Your right! But she stalked me on messenger after we met. At the karate owners house. And I was attracted to her too. So shit happens. But I won't let you lie about me to save your ass. Especially when I have all the proof! The only one that needs to know the truth. Is her husband. And it's not her first time either. That I got confirmation on Friday. That's why it's more of a big deal then people want to believe."

"[The Defendant]: I told [our] karate master. He's trying to cover it up. And I have correspondence between her and him to that fact. And they don't like it! I've been forced out of karate while she gets to continue."

"[Hart Field]: They are pissed that you wouldn't let it go . . . she probably has done this before . . . probably with the karate master . . . lol . . . I don't know why you chose to tell anyone though??"

"[The Defendant]: I chose to tell because I tried to break it off back in January. And she came unglued! All but begging me to stay! And I have those text messages. For once I saved things. If she has to leave her family because of this, the karate school will fall."

"[The Defendant]: I've been harrased by the state police in this area because of it."

"[Hart Field]: I would like to say that I could let it go . . . but . . . in all honesty I think I would send one picture that proves my point and let it go . . . especially if people are thinking you made all this up and it's your imagination or worse. . ."

"[The Defendant]: I have many pictures! And messages that I retrieved from my phone by having it rooted! But I'm prohibited from contact with her or her family. It's her last ditch effort to silence me legally."

"[Hart Field]: I would think the hubby would WANT to see proof . . . I know I would."

"[The Defendant]: But plenty of people in the area know but the one person that doesn't is her husband!"

"[The Defendant]: Exactly Tracy! And I have it ALL!!!!!!"

"[Hart Field]: It's easy for others to say 'let it go' . . . it's different when it's your life."

After receiving the screenshots from Walters, A vomited, had a panic attack, and "was completely and totally terrified that [her] entire life was going to be ruined on social media." A few weeks later, on May 12, 2018, A went to the police and provided a formal written statement. Trooper Howard Smith of the Connecticut State Police was assigned to investigate her allegations and confirmed that she had a valid restraining order against the defendant at the time of some of the Facebook posts.

On the sole basis of the aforementioned April 7, 2018 Facebook conversation, the state charged the defendant with criminal violation of a restraining order in violation of § 53a-223b, stalking in the second degree in violation of § 53a-181d, and harassment in the second degree in violation of § 53a-183.[9]

A five day jury trial was held in November, 2019. Walters and A both testified. The state also admitted into evidence numerous exhibits that depicted posts and messages from the defendant's social media accounts. In addition to exhibit 11, which contained the screenshots of the April 7, 2018 Facebook conversation that formed the basis of the defendant's convictions, the state was permitted to introduce prior social media posts of the defendant under the uncharged misconduct rule.[10] Those included, among others:

• Plaintiff's exhibit 1, which was a screenshot of a Twitter post containing a picture of A's face and captioned: "Sex scandal rocks [karate school], Danielson ct. Married instructor seeks student out on messenger starts an affair."

• Plaintiff's exhibit 4, which was a screenshot of an Instagram post containing a photograph of A's property and captioned: "Pictures from today's ride."

• Plaintiff's exhibit 5, which was a screenshot of a Facebook post that referred to A as "a cheater and pathological li[a]r." The post also included a screenshot of an Instagram post that the defendant had allegedly made, which included a picture of A and was captioned: "2 Dan at [karate school]. Adultery and pathological li[a]r. #givesgoodhead."

• Plaintiff's exhibit 6, which was a screenshot of a Facebook post that was apparently intended for A's daughter, stating, "I got one of your mom's favorite picture[s] of me for you! Daughter is probably like mother?"

• Plaintiff's exhibit 7, which included a screenshot of a Facebook post containing a picture of A and captioned: "Love those lady parts. Lol."

• Plaintiff's exhibit 7, which included a screenshot of a Facebook post containing a picture of A and captioned: "You can shut down all my social media [sites]. But the good pictures will make [their] way [where] they need [to]! I fucking promise!"

• Plaintiff's exhibit 10, which was a screenshot of a conversation on Facebook messenger between the defendant and A in which the defendant told A that she had "lied [her] way out yet again" and asked whether he should expect a visit from A's husband.

After the state rested its case, the defendant moved for a judgment of acquittal, arguing that the state had failed to prove each count beyond a reasonable doubt

because it had not established that the defendant had the required intent to violate the criminal restraining order or to harass or stalk A because none of his posts contained in the April 7, 2018 Facebook conversation was directed at her. The defendant also argued, with respect to the stalking charge, that the state had failed to prove that a course of conduct occurred because the charged conduct all happened on a single day. The state responded that it was not required to show that the defendant's posts had been directed at A in order to prove intent and that a course of conduct could occur on a single day, which it did here, on the basis of the multiple posts that the defendant made. The court denied the defendant's motion for acquittal.

Thereafter, the jury found the defendant guilty on all counts. The court accepted the jury's verdict and sentenced the defendant to a total effective term of five years of incarceration, suspended after nine months, with three years of probation.[11] The court also issued a standing criminal protective order prohibiting any contact with or communications about A and her family.

On December 3, 2019, the defendant filed a motion for a new trial, wherein he argued, in relevant part, that he was entitled to a new trial because (1) the court had erred in admitting into evidence screenshots of his social media posts and messages because they were not properly authenticated and (2) the state had repeatedly violated applicable discovery rules. The court denied the motion, and this appeal followed. Additional facts and procedural history will be set forth as needed.

I

The defendant first claims that the court abused its discretion when it admitted into evidence screenshots of his social media posts and messages because the screenshots were not properly authenticated. We disagree.

We first set forth the following additional facts and procedural history. At trial, the state sought to introduce screenshots of the defendant's posts and messages, summarized previously in this opinion, from his various social media accounts. The defendant objected to the admission of the screenshots, arguing that they could not be properly authenticated because neither A nor Walters could prove definitively that the posts and messages had been made by the defendant. Before the court ruled on admissibility, Walters testified outside of the presence of the jury regarding the screenshots.

Walters first testified about how he searched for and located the defendant's social media pages. To find the defendant's Facebook page, Walters searched the defendant's name in Facebook's search bar. That search pulled up two profiles associated with the defendant, an active account that the defendant was currently using and an older, inactive account. Walters then testi-

fied that the accounts had a number of distinctive characteristics that led him to believe that they both belonged to the defendant. Specifically, both accounts included the defendant's name and numerous pictures of the defendant, the accounts had previously liked or commented on posts that A had made and she had responded back, "[t]here were also other people from the karate school that [the accounts] had friended," and the content of the posts on both accounts often referenced private details about A. Walters also noted that, although he was not Facebook friends with the defendant, he was able to see everything that the defendant posted because the defendant's Facebook pages were publicly available.

Walters also explained that he had located the defendant's Instagram account by searching for the defendant's name and then confirming that the username for the resulting account matched the unique username that A had given him for the defendant's Instagram account. A previously had exchanged messages with the defendant on this account. Walters further concluded that the account belonged to the defendant because it included pictures of the defendant and posts that again referred to private details about A. Last, Walters testified that he located the defendant's Twitter account by searching Twitter for the defendant's name and then identifying the defendant's account on the basis of his profile picture and the content of the page. Walters believed that the Twitter account associated with the defendant's name belonged to the defendant because the account included a picture of the defendant at a gym, where Walters knew that the defendant was a member, and again included posts that referenced private details about A.

Walters further testified that his searches for the defendant's social media accounts had brought up other accounts that were associated with individuals who had the same name as the defendant but that he was able to determine that those other accounts did not belong to the defendant because some of the accounts belonged to women and the other accounts belonged to younger men.

Walters then testified about how he took screenshots and shared the defendant's posts. According to Walters, he used either buttons or swipes on his cell phone to screenshot pictures of the defendant's social media posts and then saved those screenshots to his device. Walters then time stamped the screenshots, although he admitted that the format of the time stamps was not consistent because sometimes the time stamps were in the American format (month/day/year) and other times they were in the European format (day/month/year). After Walters time stamped the screenshots, he sent them to A. Walters also testified that all of the screenshots that the state intended to admit had come from

the defendant's social media accounts.

After Walters testified, the court ruled that exhibits 1, 2a, 5, 6a, 7, 12 and 13 had been properly authenticated and could be admitted into evidence through Walters on the following day. On November 5, 2019, Walters testified in the presence of the jury, and the state admitted exhibits 1, 2a, 5, 6a, 7 and 13 into evidence. During his testimony, Walters largely reiterated the testimony that he had given the day before outside the presence of the jury.

On November 6, 2019, the state introduced several additional screenshots—exhibits 4, 10 and 11—through A. Of those screenshots, exhibits 4 and 11 had been taken by Walters, and exhibit 10 was the sole screenshot taken by A. Although exhibits 4 and 10 were not admitted into evidence through Walters' testimony, he did testify that the screenshots in both exhibits had come from the social media accounts he had linked to the defendant.

With respect to exhibit 4, A testified that it was a screenshot that Walters had taken from the defendant's Instagram account and that the screenshot fairly and accurately represented the way it looked when Walters sent it to her. A further stated that she believed the post was from the defendant's Instagram account because the account's profile picture was of the defendant and the username associated with the account matched the defendant's username for his Instagram account. She also testified that she was familiar with the defendant's Instagram because she and the defendant had previously followed each other on Instagram and used it to exchange messages. With respect to exhibit 10, A testified that it showed a private Facebook conversation between her and the defendant and that she had taken a screenshot of the conversation herself. A stated that the screenshot fairly and accurately represented her Facebook conversation with the defendant and that she had not edited the screenshot. Last, A testified that exhibit 11 was sent to her as a screenshot by Walters and that the screenshot showed a series of public Facebook posts that the defendant had made about her. She confirmed that the screenshot fairly and accurately represented the way it looked when Walters sent it to her.

We next set forth the standard of review and relevant legal principles that govern our resolution of this claim. The standard of review applicable to a claim regarding authentication is well established. "We review the trial court's decision to admit evidence, if premised on a correct view of the law[12] . . . for an abuse of discretion. . . . Under the abuse of discretion standard [an appellate court] make[s] every reasonable presumption in favor of upholding the trial court's rulings, considering only whether the court reasonably could have concluded as it did." (Citation omitted; footnote added;

internal quotation marks omitted.) *State* v. *Rivera*, 343 Conn. 745, 759, 275 A.3d 1195 (2022).

"Authentication . . . is viewed as a subset of relevancy, because evidence cannot have a tendency to make the existence of a disputed fact more or less likely if the evidence is not that which its proponent claims. . . . Our Code of Evidence provides that [t]he requirement of authentication as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the offered evidence is what its proponent claims it to be. . . . [A] writing may be authenticated by a number of methods, including direct testimony or circumstantial evidence. . . .

"[T]he showing of authenticity is not on a par with the more technical evidentiary rules that govern admissibility, such as hearsay exceptions, competency and privilege. . . . Rather, there need only be a prima facie showing of authenticity to the court. . . . Once a prima facie showing of authorship is made to the court, the evidence, as long as it is otherwise admissible, goes to the jury, which will ultimately determine its authenticity. . . .

"It is widely recognized that a prima facie showing of authenticity is a low burden. . . . This is because [a] proponent of evidence is not required to *conclusively prove the genuineness* of the evidence *or to rule out all possibilities inconsistent with authenticity.* . . .

"[E]lectronic communications, such as text messages, are subject to the same standard of authentication and the same methods of authentication as other forms of evidence: As with any other form of evidence, a party may use any appropriate method, or combination of methods . . . or any other proof to demonstrate that the proffer is what its proponent claims it to be, to authenticate any particular item of electronically stored information. . . .

"One such appropriate method of authentication . . . is that [a] witness with personal knowledge may testify that the offered evidence is what its proponent claims it to be. . . .

"[Moreover] [t]he distinctive characteristics of an object, writing or other communication, when considered in conjunction with the surrounding circumstances, may provide sufficient circumstantial evidence of authenticity." (Citations omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) *State* v. *Manuel T.*, 337 Conn. 429, 453–56, 254 A.3d 278 (2020).

Further, "[t]he government may authenticate a document solely through the use of circumstantial evidence, including the document's own distinctive characteristics and the circumstances surrounding its discovery." (Internal quotation marks omitted.) *State* v. *John L.*, 85 Conn. App. 291, 301, 856 A.2d 1032, cert. denied, 272

Conn. 903, 863 A.2d 695 (2004). Finally, "[c]onclusive proof of authenticity is not required," and the government "can also rely on the contents of the [document] to establish the identity of the declarant." (Internal quotation marks omitted.) Id., 302.

On appeal, the defendant claims that the screenshots the state entered into evidence through Walters and A were not properly authenticated because neither witness had personal knowledge to testify that the evidence was what they claimed it to be and neither witness could prove that the defendant had authored the contents of the screenshots. The state, on the other hand, argues that the screenshots that were admitted through Walters and A were properly authenticated because both witnesses knew the defendant and were able to identify numerous distinctive characteristics in the exhibits. We agree with the state.

Walters testified that he knew the defendant from the karate school, that he was good friends with A, and that he was aware of the affair. He also testified as to how he found the defendant's social media accounts and described the steps that he took to verify which accounts belonged to the defendant and which accounts belonged to other individuals who happened to have the same name as the defendant. Specifically, Walters used his knowledge of what the defendant looked like, his sex, and his age to determine that social media accounts associated with younger men and women likely did not belong to the defendant.

With regard to all of the screenshots of Facebook posts that were admitted into evidence, Walters testified that he believed the defendant was the author of those posts because the Facebook accounts that the posts came from contained the defendant's name and pictures of the defendant, including the accounts' profile pictures; the accounts were Facebook friends with other students and instructors at the karate school and shared mutual Facebook friends with A; and the posts contained private information about A, as well as pictures of A and a reference to her daughter. Importantly, Walters testified that he observed that the accounts previously interacted with A's Facebook account, in that the defendant previously had liked or commented on A's posts and A had responded back to the accounts. As to the screenshot of a Twitter post that the state admitted into evidence, Walters testified that he believed the defendant had authored the post because the Twitter account in question included the defendant's name, a profile picture of the defendant, and a picture of the defendant at a gym, where Walters knew that the defendant was a member. Additionally, the post contained a picture of A and referenced a "sex scandal" involving her that had occurred at the karate school. Finally, with respect to the Instagram posts that the state admitted into evidence, Walters testified that he

believed the defendant had authored the posts because the Instagram account's unique username matched the username that A had given him for the defendant's Instagram account, the account included pictures of the defendant, and the content of the posts again contained pictures of A, references to the karate school, and a reference to A's daughter.

A testified that she had been friends with the defendant on Facebook and Instagram and had interacted with him on both platforms. With respect to two of the exhibits that she authenticated, exhibits 4 and 11, A testified that the screenshots had been sent to her by Walters, that the screenshots fairly and accurately represented the way they looked when Walters sent them to her, and that she had not edited the screenshots. A further testified that she believed that exhibit 4, a screenshot of an Instagram post, had come from the defendant's Instagram account because she was familiar with the defendant's Instagram username and profile picture and both matched the information associated with the account that had posted the screenshot in exhibit 4. Exhibit 10, the only exhibit that A took screenshots of, was a private Facebook conversation between her and the defendant. A testified that the exhibit fairly and accurately reflected the conversation she had with the defendant and that she did not edit or alter that screenshot. Last, with respect to exhibit 11—screenshots of the April 7, 2018 Facebook conversation—A testified that the posts included references to private details about her and her family, the affair, and the karate school.

As summarized in the preceding paragraphs, the distinctive characteristics that Walters and A relied on to establish that the social media posts and messages in question were written and published by the defendant— including that (1) the content of the posts repeatedly referenced A, the affair, and the karate school, (2) the social media accounts in question included the defendant's name, his unique social media usernames, and multiple pictures of the defendant, (3) the Facebook accounts, in particular, were friends with other members of the karate school and mutual friends of A, and (4) the Facebook accounts and Instagram account previously had interacted with A—were sufficient to properly authenticate the exhibits. See *State* v. *Manuel T.*, supra, 337 Conn. 456, 461 (content of text messages, which included information about victim's age, job, family, and boyfriend, was sufficient to authenticate messages); *State* v. *John L.*, supra, 85 Conn. App. 302 (documents were properly authenticated on basis of circumstantial evidence that linked defendant to documents). Moreover, with respect to exhibit 10, A's testimony that the exhibit accurately represented the conversation she had with the defendant over Facebook was sufficient on its own to authenticate the exhibit. See *State* v. *Smith*, 179 Conn. App. 734, 764–65, 181

A.3d 118 (Facebook message was properly authenticated because proponent of message testified that she had received message and had personal knowledge of defendant and that content of message led her to believe it was sent by defendant), cert. denied, 328 Conn. 927, 182 A.3d 637 (2018).

The defendant argues that Walters' and A's authentications were insufficient because they could not prove that the defendant authored the social media posts in question and the primary identifying features that both witnesses relied on were the accounts' names and profile pictures. We disagree. First, the state was not required to conclusively prove that the defendant wrote and published the posts. See *State* v. *Manuel T.*, supra, 337 Conn. 454 (for purposes of authentication, "[a] proponent of evidence is not required to conclusively prove the genuineness of the evidence or to rule out all possibilities inconsistent with authenticity" (emphasis omitted; internal quotation marks omitted)). Second, as summarized previously in this opinion, Walters and A both relied on more than just the accounts' names and photographs to authenticate the screenshots, including the fact that the Facebook accounts were friends with other members of the karate school and shared mutual friends with A, the specific content of the screenshots, and that previous interactions between the defendant and A had occurred on his social media accounts.

We similarly disagree with the defendant's argument that Walters and A could not properly authenticate the screenshots of the posts contained in exhibit 11 because neither was the author or the recipient of the defendant's social media posts. Although Walters and A did not author or directly receive any of the defendant's posts, they both viewed the posts, either on the defendant's social media accounts or via screenshots that had been taken of those accounts, and were able to directly link the defendant to the posts on the basis of the content and distinctive characteristics of the posts and the accounts. That is sufficient for authentication. See *United States* v. *Bradley*, United States District Court, Docket No. 3:21-CR-00087 (VAB) (D. Conn. May 27, 2022) ("[a]ssuming the [g]overnment offers testimony from a witness who visited [the defendant's] Facebook page and observed the Facebook posts, this testimony is sufficient to authenticate the exhibits as [the defendant's] Facebook posts").

We also are unpersuaded by the defendant's argument that the social media accounts from which the screenshots were taken may have either been fake accounts or accounts that were hacked and, thus, the posts could not have been properly authenticated. As support for this assertion, the defendant points to A's testimony at trial that the defendant had previously shut down his Facebook page and that the defendant had told Trooper Smith that his Facebook account had been

hacked. "[Q]uestions about the integrity of electronic data [however] generally go to the *weight* of electronically based evidence, *not its admissibility.*" (Emphasis in original; internal quotation marks omitted.) *State* v. *Manuel T.*, supra, 337 Conn. 461. Moreover, as previously stated in this opinion, "the bar for a finding of authenticity is not high. . . . A party proffering evidence does not have the burden to disprove all possible inconsistencies with authenticity, or prove beyond all doubt that the [exhibits] are what the party purports them to be." (Citation omitted.) *Gagliardi* v. *Commissioner of Children & Families*, 155 Conn. App. 610, 621, 110 A.3d 512, cert. denied, 316 Conn 917, 113 A.3d 70 (2015). Accordingly, concerns that the social media accounts associated with the defendant were either fake or hacked, even when there is perhaps some evidence to support those concerns, are not enough to bar authentication of the screenshots here. For these same reasons, we also disagree with the defendant's argument that the exhibits could not have been properly authenticated because "the 'date stamps' on the postings were erratic," and, thus, it was "impossible to say when any given screenshot was actually taken." See id.; see also *State* v. *Manuel T.*, supra, 456 (screenshots could properly be authenticated without date of communication listed on exhibit).[13]

Accordingly, for the reasons set forth herein, the screenshots were properly authenticated by Walters and A, and the court, therefore, did not abuse its discretion in admitting those screenshots into evidence.

## II

The defendant next argues that there was insufficient evidence to convict him of stalking in the second degree in violation of § 53a-181d and harassment in the second degree in violation of § 53a-183.[14] He contends that both statutes are unconstitutional as applied to him because he "was prosecuted on the content of his communication, not on the conduct of it." In his view, absent protected speech, there is insufficient evidence to support his convictions.

The state takes a different view. With respect to the defendant's stalking conviction, it argues that it "did not punish the content of his speech, but rather a course of conduct that was, in part, informed by speech." The state thus contends that the speech contained in the defendant's April 7, 2018 Facebook conversation is unprotected under the "speech integral to criminal conduct exception" to the first amendment. At the same time, the state argues that the defendant's harassment conviction "was based on speech and nonspeech" components. Although it does not argue that the speech integral to criminal conduct exception applies to the harassment conviction, the state nevertheless argues that, in accordance with *United States* v. *O'Brien*, 391 U.S. 367, 377, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968), it

"has a sufficient interest in regulating the nonspeech element, which justifies the incidental limitations on [the defendant's] first amendment freedoms." The state argues that the evidence presented was sufficient for the jury to reasonably infer that the defendant had the necessary mental states and that the posts were likely to come to A's attention. For the reasons discussed herein, we conclude that the defendant's stalking and harassment convictions cannot stand because the statutes as applied to the defendant violate his rights under the first amendment.[15]

## A

### Legal Principles

The legal principles at the heart of this claim are foundational. The first amendment, applicable to the states through the fourteenth amendment, provides that "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const., amend. I. "[A]s a general matter, the [f]irst [a]mendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." (Internal quotation marks omitted.) *Ashcroft* v. *American Civil Liberties Union*, 535 U.S. 564, 573, 122 S. Ct. 1700, 152 L. Ed. 2d 771 (2002). The state may violate this mandate in various ways, "but a law imposing criminal penalties on protected speech is a stark example of speech suppression." *Ashcroft* v. *Free Speech Coalition*, 535 U.S. 234, 244, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002).

There can be little dispute that the first amendment extends to an individual's posts on social media. See *Mahanoy Area School District* v. *B. L.*, U.S. , 141 S. Ct. 2038, 2042–43, 210 L. Ed. 2d 403 (2021) (student's social media posts, which included vulgar and crude speech, were protected by first amendment); *Packingham* v. *North Carolina*, U.S. , 137 S. Ct. 1730, 1735–36, 198 L. Ed. 2d 273 (2017) ("[i]n short, social media users employ these websites to engage in a wide array of protected [f]irst [a]mendment activity on topics 'as diverse as human thought' ").

The first amendment's protections, however, are not absolute. There are various "well-defined and narrowly limited classes of speech" that are not protected, including, among others, obscenity, defamation, fraud, incitement, and speech integral to criminal conduct. *Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 571–72, 62 S. Ct. 766, 86 L. Ed. 1031 (1942); see also *United States* v. *Stevens*, 559 U.S. 460, 468–69, 130 S. Ct. 1577, 176 L. Ed. 2d 435 (2010). Speech that does not fall into these exceptions remains protected. See *United States* v. *Stevens*, supra, 468–69; *Chaplinsky* v. *New Hampshire*, supra, 571–72. But just because speech may be considered crude or in bad taste does not necessarily bring that speech outside the protection of the first amend-

ment. See *Mahanoy Area School District* v. *B. L.*, supra, 141 S. Ct. 2048 ("sometimes it is necessary to protect the superfluous in order to preserve the necessary"). The United States "Supreme Court has consistently classified emotionally distressing or outrageous speech as protected, especially where that speech touches on matters of political, religious or public concern." *United States* v. *Cassidy*, 814 F. Supp. 2d 574, 582 (D. Md. 2011), appeal dismissed, Docket No. 12-4048, 2012 WL 13228525 (4th Cir. April 11, 2012).

"When assessing the constitutionality of a statute, we exercise de novo review and make every presumption in favor of the statute's validity. . . . We are also mindful that legislative enactments carry with them a strong presumption of constitutionality, and that a party challenging the constitutionality of a validly enacted statute bears the heavy burden of proving the statute unconstitutional beyond a reasonable doubt . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Nowacki*, 155 Conn. App. 758, 780, 111 A.3d 911 (2015).

B

Criminal Stalking

The operative language of the second degree criminal stalking statute provides in relevant part: "A person is guilty of stalking in the second degree when: (1) Such person knowingly engages in a course of conduct directed at a specific person that would cause a reasonable person to (A) fear for such person's physical safety or the physical safety of a third person, or (B) suffer emotional distress . . . ." General Statutes (Supp. 2018) § 53a-181d (b). A "course of conduct" means "two or more acts, including, but not limited to, acts in which a person directly, indirectly or through a third party, by any action, method, device or means, including, but not limited to, electronic or social media, (1) follows, lies in wait for, monitors, observes, surveils, threatens, harasses, communicates with or sends unwanted gifts to, a person, or (2) interferes with a person's property . . . ." General Statutes (Supp. 2018) § 53a-181d (a).[16]

Although it is clear from the language of the stalking statute that it is directed at conduct, specifically, a "course of conduct," it is apparent that a "course of conduct" under § 53a-181d can be established through conduct and unprotected speech alike, similar to that of the criminal harassment statute. See *State* v. *Moulton*, 310 Conn. 337, 342, 78 A.3d 55 (2013) (both conduct and unprotected speech can form basis for harassment conviction); see also *United States* v. *Osinger*, 753 F.3d 939, 944, 946 (9th Cir. 2014) ("course of conduct" required to establish violation of federal interstate stalking statute may be established by conduct and speech components).

The defendant argues that his stalking conviction was not based on any conduct but was based exclusively

on the April 7, 2018 Facebook conversation—a constitutionally protected conversation that he had with a third party on his own Facebook page—and, thus, his conviction violates his first amendment rights. The state disagrees and argues that the defendant's first amendment rights were not violated because the speech contained in his April 7, 2018 Facebook conversation was not protected and the defendant's conviction was based on nonspeech conduct. Although the state concedes that the defendant's speech contained in the April 7, 2018 Facebook conversation, which forms the sole basis for the defendant's convictions, "does not fall into the unprotected categories of speech of true threats, fighting words, or obscenity," it contends that the speech in question is unprotected because it falls within the speech integral to criminal conduct exception to the first amendment. We are not persuaded.

The United States Supreme Court case from which the speech integral to criminal conduct exception mainly emerged, *Giboney* v. *Empire Storage & Ice Co.*, 336 U.S. 490, 69 S. Ct. 684, 93 L. Ed. 834 (1949), established that the first amendment extends no protection to "speech or writing used as an integral part of conduct in violation of a valid criminal statute." Id., 498. The speech in question in *Giboney* was a labor union's picketing in an effort to pressure all nonunion peddlers to join. Id., 492. In furtherance of this goal, the union set out to obtain agreements from all of the wholesale ice distributors in the area to not sell ice to nonunion peddlers. Id. All of the distributors agreed with the exception of Empire Storage and Ice Company, and, thus, the picketing was aimed at this last holdout company. Id. Empire Storage and Ice Company, relying on a Missouri statute that made it illegal to refuse to sell to nonunion peddlers, sought an injunction to stop the picketing, which it obtained. Id., 492–93. The Missouri Supreme Court upheld the injunction. Id., 494. The petitioners appealed to the United States Supreme Court, arguing that the statute at issue in that case, as applied to them, violated their first amendment rights. Id., 495. The court was not persuaded. Id., 501. It noted that refusal to sell to nonunion peddlers was illegal under the Missouri law, and, thus, picketing was aimed at compelling another entity to break the law. Id., 501–502. The court stated that "it has never been deemed an abridgement of freedom of speech or press to make *a course of conduct* illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." (Emphasis added.) Id., 502.

The contours of the *Giboney* exception have yet to be clearly defined and have been subject to considerable criticism, especially in light of more recent United States Supreme Court precedent, such as *Holder* v. *Humanitarian Law Project*, 561 U.S. 1, 27–28, 130 S. Ct. 2705, 177 L. Ed. 2d 355 (2010), which appears incon-

gruent with *Giboney*'s rationale. See, e.g., *King* v. *Governor of New Jersey*, 767 F.3d 216, 225–26 (3d Cir. 2014), cert. denied sub nom. *King* v. *Christie*, 575 U.S. 996, 135 S. Ct. 2047, 191 L. Ed. 2d 955 (2015); *United States* v. *Matusiewicz*, 84 F. Supp. 3d 363, 369 (D. Del. 2015), aff'd sub nom. *United States* v. *Gonzalez*, 905 F.3d 165 (3d Cir. 2018), cert. denied,    U.S.   , 139 S. Ct. 2727, 204 L. Ed. 2d 1120 (2019); E. Volokh, "The 'Speech Integral to Criminal Conduct' Exception," 101 Cornell L. Rev. 981, 988 (2016). Nevertheless, for the speech integral to criminal conduct exception to apply, the speech in question must, at a minimum, be *integral* to criminal conduct other than protected speech. See, e.g., *United States* v. *Petrovic*, 701 F.3d 849, 855 (8th Cir. 2012) ("[t]he communications for which [the defendant] was convicted under [18 U.S.C.] § 2261A (2) (A) were integral to this criminal conduct as they constituted the means of carrying out his extortionate threats"). It does not apply if a defendant is doing nothing more than speaking.

Here, the state contends that the defendant's conviction was based, in part, on nonspeech conduct. Specifically, the state argues that "the defendant's course of conduct [was] comprised of nonspeech components of logging into his social media account, creating a digital billboard, and choosing to repeatedly post messages, as well as a speech component of the content of the posts." It contends that "[t]he repetitive, cumulative nature of the defendant's posting created something more than the content of the words in the posts, and that is a course of conduct." The state therefore argues that "the speech associated with the defendant's Facebook posts was integral to the criminal conduct of posting approximately thirteen times" on his own Facebook page.

We are not persuaded that the defendant engaged in any nonspeech conduct for which the speech in question could be integral. The record reflects that the defendant engaged in a single Facebook conversation with a third party on his own Facebook page, which occurred after A already had unfriended him on Facebook. It is undisputed that, on the day in question, the defendant did not send any messages directly to A or her family, show up at A's home or place of employment, or cause others to do so. The state argues that, by logging into his own Facebook account and posting on his own Facebook page, the defendant somehow engaged in nonspeech conduct for which the speech in question was integral. Those actions, in and of themselves, however, cannot constitute nonspeech "conduct" for purposes of the speech integral to criminal conduct exception. Rather, they constitute the means by which the defendant spoke in this case. If the very act of posting a message on one's own Facebook page "implicates conduct . . . then a newspaper article likewise implicates conduct in the sense that a printing press or a

computer printer has to put ink on paper . . . ." (Internal quotation marks omitted.) E. Volokh, supra, 101 Cornell L. Rev. 1039.

In this case, it is clear that the defendant's Facebook posts were not integral to criminal conduct; they *were* the criminal conduct. See *People* v. *Relerford*, 104 N.E.3d 341, 352 (Ill. 2017) (concluding that speech integral to criminal conduct exception was not applicable because there was not some other criminal act; content of Facebook posts was criminal act); *State* v. *Shackelford*, 264 N.C. App. 542, 556, 825 S.E.2d 689 (2019) (speech integral to criminal conduct exception was inapplicable because "speech itself was the crime"); see also *United States* v. *Osinger*, supra, 753 F.3d 954 (Watford, J., concurring) ("The [c]ourt in *Giboney* made clear that the union's picketing lost its [f]irst [a]mendment protection only because the union was 'doing more than exercising a right of free speech or press. . . .' If a defendant is doing nothing but exercising a right of free speech, without engaging in any non-speech conduct, the exception for speech integral to criminal conduct shouldn't apply." (Citation omitted.)); *United States* v. *Cook*, 472 F. Supp. 3d 326, 332 (N.D. Miss. 2020) ("[T]he government has not alleged that [the defendant] ever directly contacted any of the subjects of his Facebook posts. Rather, [the defendant] is being prosecuted solely on the content of his public posts—not the act of posting." (Emphasis omitted.)). If one were to remove the content of the speech altogether in the present case, one would be left only with the defendant sending a few Facebook posts back and forth with a third party, unrelated to the only identified victim, A. That alone would not, and could not, serve as a basis for violating the statute. It is clear that "[t]he only 'conduct' which the [s]tate sought to punish is the fact of communication. Thus, we deal here with a conviction resting solely upon 'speech' . . . ." (Citation omitted.) *Cohen* v. *California*, 403 U.S. 15, 18, 91 S. Ct. 1780, 29 L. Ed. 2d 284 (1971).

The state relies, in large part, on a number of federal court decisions that upheld convictions under the federal cyberstalking statute. See 18 U.S.C. § 2261A (2018). Those cases, however, are materially different from the present case. The key distinction between those cases and the present case is that the defendants in those cases engaged in unprotected nonspeech conduct, in addition to speech, and the speech in question was integral to some criminal offense. Unlike in the present case, the defendants in those cases were not convicted solely on the basis of their speech. See *United States* v. *Osinger*, supra, 753 F.3d 952–53 (Watford, J., concurring) (The defendant's course of conduct "began in Illinois when he harassed [the victim] by repeatedly showing up at her home and workplace, despite her efforts to avoid him. It continued after she moved to California, initially through a string of unwelcome and

implicitly threatening text messages, and then through a fake Facebook page and emails sent to [the victim's] co-workers. . . . What makes this a straightforward case is the fact that [the defendant] committed the offense by engaging in both speech and unprotected non-speech conduct." (Citations omitted.)); *United States* v. *Sayer*, 748 F.3d 425, 434 (1st Cir. 2014) (defendant's conduct included creating false online advertisements and accounts in Jane Doe's name or impersonating Jane Doe on Internet and enticing men to show up at her house for sexual encounters); *United States* v. *Petrovic*, supra, 701 F.3d 855 (defendant's harassing and distressing communications were integral to criminal conduct of extortion).

The reason why courts require something more than otherwise protected speech in order for the speech integral to criminal conduct exception to apply is clear. Without such a requirement, states could criminalize traditionally protected forms of speech and then prosecute individuals under that exception on the basis of the theory that the individual's speech constitutes the conduct integral to the commission of the offense. See *United States* v. *Matusiewicz*, supra, 84 F. Supp. 3d 369 ("[u]nder the broadest interpretation, if the government criminalized any type of speech, then anyone engaging in that speech could be punished because the speech would automatically be integral to committing the offense"). A number of courts that have applied the speech integral to criminal conduct exception, including cases on which the state principally relies, have recognized this danger and cautioned against interpreting the exception too broadly. See id. ("it is important that [courts] avoid interpreting *Giboney*'s exception too broadly"); see also *United States* v. *Osinger*, supra, 753 F.3d 954 (Watford, J., concurring) ("[i]f a defendant is doing nothing but exercising a right of free speech, without engaging in any non-speech conduct, the exception for speech integral to criminal conduct shouldn't apply"). Accepting the state's argument in this case would be a "recipe for clandestinely denying full [f]irst [a]mendment protection to all speech in all media." E. Volokh, supra, 101 Cornell L. Rev. 1039.

Because it is clear that the defendant's stalking conviction was predicated solely on constitutionally protected speech, his conviction cannot stand. See *State* v. *Parnoff*, 329 Conn. 386, 394, 186 A.3d 640 (2018) ("[t]he first amendment bars the states from criminalizing pure speech, unless that speech falls into one of a few constitutionally unprotected categories" (emphasis omitted)); *State* v. *Moulton*, supra, 310 Conn. 362 ("[W]e recognize that our interpretation of § 53a-183 (a) (3) permitting a jury to consider the caller's speech in determining whether the call was alarming or harassing potentially gives rise to first amendment concerns. Such constitutional concerns, however, readily may be eliminated by limiting the reach of the statute to speech,

like true threats, that is not protected by the first amendment.") Taking the protected speech out of the equation, the remaining evidence in the present case is insufficient to sustain a conviction under the stalking statute. See *State* v. *Nowacki*, supra, 155 Conn. App. 788–89 (after removing protected speech from consideration, remaining evidence was insufficient to sustain conviction). Accordingly, the judgment with respect to the defendant's stalking in the second degree conviction must be reversed.

## C

### Criminal Harassment

The operative language of the second degree harassment statute provides in relevant part: "A person is guilty of harassment in the second degree when: (1) By telephone, he addresses another in or uses indecent or obscene language; or (2) with intent to harass, annoy or alarm another person, he communicates with a person by telegraph or mail, by electronically transmitting a facsimile through connection with a telephone network, by computer network, as defined in section 53a-250, or by any other form of written communication, in a manner likely to cause annoyance or alarm; or (3) with intent to harass, annoy or alarm another person, he makes a telephone call, whether or not a conversation ensues, in a manner likely to cause annoyance or alarm." General Statutes (Rev. to 2017) § 53a-183 (a).[17]

On appeal, as he did with his stalking conviction, the defendant argues that his harassment conviction was based exclusively on the April 7, 2018 Facebook conversation—a constitutionally protected conversation that he had with a third party on his own Facebook page—and, thus, his conviction violates his first amendment rights. The state disagrees. Instead of arguing that the defendant's posts contained in the April 7, 2018 Facebook conversation were unprotected speech, the state argues that "[t]he defendant's conviction of harassment in the second degree, under § 53-183, did not infringe upon his first amendment rights because the defendant's Facebook posts consisted of speech and nonspeech, and under the test set forth in [*United States* v. *O'Brien*, supra, 391 U.S. 377], the government has a sufficient interest in regulating the nonspeech element to justify the incidental limitations on first amendment freedoms." We disagree with the state.

Here, the harassment statute is unconstitutional as applied to the defendant for largely the same reasons that the criminal stalking statute is unconstitutional. That conviction, like the stalking conviction, rested solely on the content of the defendant's April 7, 2018 Facebook conversation with a third party. Although the state contends that the less demanding standard of review utilized in *United States* v. *O'Brien*, supra, 391 U.S. 377, is applicable, and that it can satisfy that stan-

dard, its argument is misplaced. In *O'Brien*, the United States Supreme Court applied what is now commonly known as "intermediate scrutiny," under which a "content-neutral regulation will be sustained under the [f]irst [a]mendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broadcasting System, Inc.* v. *Federal Communications Commission*, 520 U.S. 180, 189, 117 S. Ct. 1174, 137 L. Ed. 2d 369 (1997). *O'Brien*, however, "does not provide the applicable standard for reviewing a content-based regulation of speech," which is the type of regulation at issue in the present case. *Holder* v. *Humanitarian Law Project*, supra, 561 U.S. 27; see id. ("The [g]overnment is wrong that the only thing actually at issue in this litigation is conduct, and therefore wrong to argue that *O'Brien* provides the correct standard of review. . . . [Title 18 of the United States Code, § 2339B] regulates speech on the basis of its content." (Citations omitted; footnote omitted.)). The United States Supreme Court has made clear that, if a statute "generally functions as a regulation of conduct"; (emphasis omitted) id.; but, "as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message," a court " 'must [apply] a more demanding standard' " than the one described in *O'Brien*. Id., 28, quoting *Texas* v. *Johnson*, 491 U.S. 397, 403, 109 S. Ct. 2533, 105 L. Ed. 2d 342 (1989). The state's *O'Brien* argument is therefore misplaced.

Furthermore, the state's argument entirely ignores our Supreme Court's decision in *State* v. *Moulton*, supra, 310 Conn. 362. In *Moulton*, our Supreme Court made clear that the reach of the second degree criminal harassment statute is limited to speech "not protected by the first amendment." Id.; see also *State* v. *Nowacki*, supra, 155 Conn. App. 783 (observing that *Moulton* allows "consideration of the content of communication when that content falls outside protected speech; for example, when it contains obscenities, true threats, or fighting words"). In the present case, the state does not argue that the speech in question that supported the defendant's harassment conviction is unprotected under any exception to the first amendment. As a result, and because the defendant's harassment conviction was predicated on speech protected by the first amendment, the defendant's harassment conviction similarly cannot stand.[18] See *State* v. *Nowacki*, supra, 783–84.

The remaining evidence, absent the protected speech, is insufficient to sustain a conviction under the harassment statute. See id., 788–89 (after removing protected speech from consideration, remaining evidence was insufficient to sustain harassment conviction). Accordingly, the judgment with respect to the defendant's harassment in the second degree conviction also must be reversed.

### III

The defendant next claims that the prosecutor committed prosecutorial impropriety by failing to comply with certain discovery requirements and by making improper statements during closing arguments. In his view, he was deprived of his right to a fair trial. We are not persuaded.[19]

We begin by setting forth the applicable legal principles and standard of review that govern our resolution of this claim. "In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and thus caused or contributed to a due process violation involves a separate and distinct inquiry." (Internal quotation marks omitted.) *State* v. *Payne*, 303 Conn. 538, 560–61, 34 A.3d 370 (2012).

"To determine whether the defendant was deprived of his due process right to a fair trial, we must determine 'whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties.' . . . *State* v. *Thompson*, 266 Conn. 440, 460, 832 A.2d 626 (2003)." *State* v. *Spencer*, 275 Conn. 171, 180, 881 A.2d 209 (2005).

### A

In the first instance, we must determine whether the defendant's claimed prosecutorial improprieties were, in fact, improprieties. The defendant's first set of alleged improprieties pertain to the state's alleged failure to comply with its discovery obligations. He argues that the state committed prosecutorial impropriety when it (1) disclosed 121 pages of discovery to the defendant immediately prior to the scheduled start of jury selection, (2) failed to provide the defendant with Walters' address and criminal history, and (3) attempted to offer a statement of the defendant as a statement of a party opponent despite not disclosing that statement to the defense.

The following additional facts and procedural history are relevant to our disposition of the defendant's claim. On September 18, 2019, the defendant filed a motion requesting that the state disclose the names and addresses of the witnesses it intended to call, as well as their statements and criminal records. The court

granted the motion and ordered the state to provide the requested materials within one week. On September 24, 2019, the day jury selection was scheduled to begin, the state provided the defendant with its list of witnesses and also provided the defendant with 121 pages of previously undisclosed discovery. The addresses and criminal records of the state's witnesses were not provided at that time. Defense counsel then argued before the court that the state's disclosure of the additional discovery was untimely and in violation of our rules of practice. Defense counsel further stated that, given this untimely disclosure, he was not ready to proceed with jury selection because he did not know what was in the new discovery.

When the court asked the state to explain, the prosecutor responded: "[W]ith respect to the hundred and twenty some odd pages, those are materials that were received within—most of them within the last week, some of them yesterday, from the victim as we're preparing for trial. . . . They're in the form of Facebook messages, Instagram, Twitter, Snapchat, that sort of thing that—that the state became aware of very recently. . . . But most of that is—and, again, just recovered within the last week or so from the victim and most of that I think is not related to the charged offenses—the time periods . . . are different—but there might be some exculpatory value in there; that's really why I'm turning it over . . . to [the] defense." The prosecutor also stated that the state would not object to a continuance for defense counsel to review the new discovery.

Defense counsel then asked the court to "dismiss the information or complaint and discharge the defendant," as a sanction for the state's untimely discovery disclosure. The court denied defense counsel's request for sanctions and instead ordered a forty-five minute recess, during which defense counsel could review the new discovery. After the court proceedings resumed, defense counsel stated that he did not want to proceed with jury selection that day, given the new documents. The court then continued jury selection until September 30, 2019, and agreed to hear the parties' outstanding motions on September 26, 2019.

On September 26, 2019, the defendant noted that he had not yet received the criminal histories or addresses for the state's witnesses, despite such disclosures being due the day before. The state then stated that it did not plan to call most of the witnesses on its list but that, for any witnesses it planned to call, it would provide the requested information to the defendant. The court then ordered the state to provide the defendant with the criminal histories and addresses for the witnesses it intended to call within one week.

By the start of trial on November 4, 2019, however, the state had not provided the defendant with criminal

histories and addresses for most of its listed witnesses. Specifically, the state had provided such information for A and her husband but had not provided that information for Walters, whom it intended to call.[20] After the defendant raised this lack of disclosure with the court, the state again promised to provide Walters' criminal history and address before he testified but also noted that it did not believe Walters had any criminal history.

On November 5, 2019, the second day of trial, the state had not provided Walters' address or criminal history. Defense counsel then asked the court to find that the state had not complied with the court's order and requested that the state be sanctioned for its noncompliance. Defense counsel proposed that "an appropriate sanction is that Mr. Walters not be allowed to testify in this matter. The alternative . . . obviously the most drastic request would be for a mistrial." Thereafter, the court asked the state to respond, to which the state remarked that the defendant could have located Walters on his own, given that Walters was a local witness whom the defendant knew. The court denied defense counsel's request for sanctions, concluding that any prejudice to the defendant from the state's failure to provide Walters' information was minimal because the defense almost certainly could have located Walters on its own, given that the defendant knew Walters and that the case involved "a relatively small community in terms of the people attending this karate school."

Thereafter, during A's testimony, the state attempted to offer into evidence a statement by the defendant that he had made during a conversation with her. Defense counsel objected, arguing that the state had never disclosed the statement that it now sought to admit. The court sustained the objection and ruled that the statement was inadmissible. The state proceeded with its case without offering the undisclosed statement.

In reviewing the defendant's claims of prosecutorial impropriety, it is manifest that the aforementioned claims amount to alleged violations of discovery orders. As this court has held, a defendant's claim that the state failed to comply sufficiently with a discovery obligation generally will not "provide a proper basis for a claim of prosecutorial [impropriety] on appeal." *State* v. *Bermudez*, 94 Conn. App. 155, 158–59, 891 A.2d 984, cert. denied, 277 Conn. 933, 896 A.2d 102 (2006). Rather, "a party seeking a remedy for the opposing party's failure to comply with required disclosures may move the trial court for an appropriate order pursuant to Practice Book § 40-5."[21] Id., 159. "Practice Book § 40-5 [grants] broad discretion to the trial judge to fashion an appropriate remedy for noncompliance with discovery." (Internal quotation marks omitted.) *State* v. *Hargett*, 343 Conn. 604, 631, 275 A.3d 601 (2022). We therefore conclude that the alleged discovery violations in the

present case do not amount to prosecutorial impropriety. We instead interpret the defendant's arguments as claims that the trial court did not properly sanction the state for alleged violations of its discovery obligations. See *State* v. *Bermudez*, supra, 159 ("[w]e . . . interpret the defendant's claim regarding [her codefendant's] statement not as a prosecutorial [impropriety] claim, but as a claim that the court should have sanctioned the prosecution by prohibiting the introduction of [her codefendant's] statement through [the police officer's] testimony"). We address these arguments in turn.

As noted, "Practice Book § 40-5 [grants] broad discretion to the trial judge to fashion an appropriate remedy for noncompliance with discovery." (Internal quotation marks omitted.) *State* v. *Hargett*, supra, 343 Conn. 631. A trial court may enter such orders as it deems appropriate, including "(1) [r]equiring the noncomplying party to comply; (2) [g]ranting the moving party additional time or a continuance; (3) [r]elieving the moving party from making a disclosure required by these rules; (4) [p]rohibiting the noncomplying party from introducing specified evidence; (5) [d]eclaring a mistrial; (6) [d]ismissing the charges; (7) [i]mposing appropriate sanctions on the counsel or party, or both, responsible for the noncompliance; or (8) [e]ntering such other order as it deems proper." Practice Book § 40-5. "[T]he primary purpose of a sanction for violation of a discovery order is to ensure that the defendant's rights are protected, not to exact punishment on the state for its allegedly improper conduct. As we have indicated, the formulation of an appropriate sanction is a matter within the sound discretion of the trial court. . . . In determining what sanction is appropriate for failure to comply with court ordered discovery, the trial court should consider the reason why disclosure was not made, the extent of prejudice, if any, to the opposing party, the feasibility of rectifying that prejudice by a continuance, and any other relevant circumstances." (Internal quotation marks omitted.) *State* v. *Respass*, 256 Conn. 164, 186, 770 A.2d 471, cert. denied, 534 U.S. 1002, 122 S. Ct. 478, 151 L. Ed. 2d 392 (2001).

Appellate review of a trial court's remedy for noncompliance with discovery, "[a]s with any discretionary action of the trial court . . . requires every reasonable presumption in favor of the action, and the ultimate issue is whether the trial court could reasonably conclude as it did. . . . In general, abuse of discretion exists when a court could have chosen different alternatives but has decided the matter so arbitrarily as to vitiate logic, or has decided it based on improper or irrelevant factors." (Citation omitted; internal quotation marks omitted.) *State* v. *Jackson*, 334 Conn. 793, 811, 224 A.3d 886 (2020).

With respect to the defendant's first alleged violation, he claims that the state improperly waited until the eve

of jury selection to provide 121 additional records it should have produced earlier during discovery. To that end, Practice Brook § 40-11 provides in relevant part: "(a) Upon written request by a defendant filed in accordance with Section 41-5 and without requiring any order of the judicial authority, the prosecuting authority, subject to Section 40-40 et seq., shall promptly, but no later than forty-five days from the filing of the request, unless such time is extended by the judicial authority for good cause shown, disclose in writing the existence of, provide photocopies of, and allow the defendant in accordance with Section 40-7, to inspect, copy, photograph and have reasonable tests made on any of the following items: (1) Any book, tangible objects, papers, photographs, or documents within the possession, custody or control of any governmental agency, which the prosecuting authority intends to offer in evidence in chief at trial or which are material to the preparation of the defense or which were obtained from or purportedly belong to the defendant . . . .

\* \* \*

"(b) In addition to the foregoing, the prosecuting authority shall disclose to the defendant, in accordance with any applicable constitutional and statutory provisions, any exculpatory information or materials that the prosecuting authority may have, whether or not a request has been made therefor."

There is no dispute that the 121 records at issue were provided to the defendant on the eve of jury selection. The record reflects, however, that the state received additional materials from the victim just prior to trial and that, pursuant to the state's continuing duty to disclose evidence, it turned over that information after it came to its attention. There was no indication that the late disclosure was done in bad faith. To the extent the defendant's argument can be interpreted as an argument that a more severe sanction should have been imposed, we are not persuaded. On learning about this late disclosure, the court reasonably gave defense counsel a forty-five minute recess during which he could review the new discovery. The court then granted defense counsel's motion for a continuance. The court's continuance sufficiently protected the defendant's rights by ameliorating the prejudice caused by the late disclosure. We therefore conclude that the court did not abuse its discretion. See *State* v. *Festo*, 181 Conn. 254, 266, 435 A.2d 38 (1980) ("trial court did not abuse its discretion by affording the defendants more time to examine and analyze the evidence in lieu of granting their motions for a mistrial and motions for suppression of evidence").

We similarly conclude that the court did not abuse its discretion when it declined to sanction the state for the state's failure to provide the defendant with Walters' criminal history and address. At trial, after the state

still had not provided that information, defense counsel asked the court to sanction the state, either by barring Walters from testifying or declaring a mistrial. The court, however, declined to order a sanction, stating: "It's, like, apparent from the record that there was noncompliance. The question is what the sanction is. The opinion of the court is that the fact situation of this matter involved a relatively small community in terms of the people attending this karate school. I think it's highly likely that your client knew who this person was. With your investigators, I think you could have found out who he was. I'm not disputing that there was failure to comply by the state, but the question is what the sanction is, and I am not going to preclude this gentleman from testifying. . . . I don't think that there is sufficient damage here to justify a sanction of precluding him from testifying, so, therefore, your request in that regard is denied."

In considering, but ultimately declining, to sanction the state for its failure to provide the defendant with Walters' criminal history and address, the court took appropriate action, as required by *State* v. *Jackson*, supra, 334 Conn. 810–11. As explained, our rules of practice give trial courts "broad discretion to . . . fashion an appropriate remedy for noncompliance with discovery." Id. In the present case, the court concluded that the severe sanction of precluding Walters from testifying was inappropriate given the minimal prejudice from the state's noncompliance. The court aptly noted that it was likely that the defendant knew who Walters was and could have obtained that information if he had chosen to do so. Additionally, the record reflects that Walters' name had been included in the list of potential witnesses at jury selection as early as October 16, 2019, and on a witness list as early as September 24, 2019, at least two weeks before the trial began on November 4, 2019. The court was well within its discretion in reaching the result that it did, particularly because the record supports the court's finding that the defendant was not sufficiently prejudiced.

Moreover, defense counsel's two requested sanctions—the suppression of relevant, material and otherwise admissible evidence or the declaration of a mistrial—are both "severe sanction[s] which should not be invoked lightly." (Internal quotation marks omitted.) *State* v. *Hargett*, supra, 343 Conn. 632; see id., 633 ("suppression of the evidence, dismissal of all charges, or a mistrial is a severe sanction that courts should invoke only when absolutely necessary"). We conclude that the trial court did not abuse its discretion because, given the specific facts at hand and the harmlessness of the state's discovery violation, the violation did not necessitate the severe sanctions defense counsel requested.

To the extent that the defendant is arguing the court

was *required* to sanction the state pursuant to *State* v. *Jackson*, supra, 334 Conn. 793, we disagree. *Jackson* does not state that a court *must* order sanctions in every case in which a party fails to comply with the rules of discovery. To the contrary, *Jackson* speaks in terms of the broad discretion that trial courts have in fashioning an *appropriate* remedy. Id., 810–11. What is appropriate in a given case will vary. This includes whether to sanction a party in the first instance. For the reasons explained, we conclude that the court was well within its discretion in not imposing the sanctions requested by defense counsel.

Finally, the defendant claims that the state failed to disclose one of the defendant's statements that it intended to introduce at trial and then tried to admit that statement at trial. In response to defense counsel's objection, the court sustained it and ruled that the statement was inadmissible. To the extent the defendant is arguing that the court should have imposed a more severe sanction, such as a mistrial, we are not persuaded. The court's ruling precluding that statement as evidence clearly ameliorated any prejudice stemming from the late disclosure of that statement. On the record before us, we cannot conclude that the court abused its discretion when it precluded the admission of the statement.

B

The defendant also makes additional claims of prosecutorial impropriety pertaining to statements made by the prosecutor during closing arguments. He claims that the prosecutor improperly (1) used the term "red herring" in advancing his argument and (2) referenced facts not in evidence. We disagree.

It is well known that "[p]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based [on] the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case." (Internal quotation marks omitted.) *State* v. *Weaving*, 125 Conn. App. 41, 46–47, 6 A.3d 203 (2010), cert. denied, 299 Conn. 929,

12 A.3d 569 (2011).

During closing argument, the prosecutor remarked: "Now, there was some cross-examination by defense counsel about when [A's] husband knew . . . [about the affair] and when he didn't know. That's . . . a red herring . . . that was a distracting bit of information. Whether . . . [A's] husband . . . knew about the affair . . . that's not relevant." According to the defendant, the state's use of the term "red herring" was improper because it questioned the credibility of and disparaged defense counsel. The state argues that the phrase "red herring" was proper because it was used to respond to the defendant's theory of defense, not to disparage defense counsel. We agree with the state.

"[T]here is ample room, in the heat of argument, for the prosecutor to challenge vigorously the arguments made by defense counsel. . . . Furthermore, [t]here is a distinction between argument that disparages the integrity or role of defense counsel and argument that disparages a theory of defense." (Citation omitted; internal quotation marks omitted.) *State* v. *Maner*, 147 Conn. App. 761, 789, 83 A.3d 1182, cert. denied, 311 Conn. 935, 88 A.3d 550 (2014). The former is improper, but the latter is permitted. Id.

In the present case, the state's use of the term "red herring" was not improper. During his cross-examination of A, defense counsel was able to elicit from her conflicting testimony regarding when she told her husband about the affair. When the state's closing argument is considered within this context, it becomes clear that the state's use of the term "red herring" was intended to rebut a portion of the defendant's theory of defense, specifically that A was not credible. Contrary to the defendant's argument, the state's use of "red herring" was not directed at defense counsel's character or credibility and did not impugn or disparage him. Thus, because the state used the phrase "red herring" to respond to the defendant's theory of the case, the use of that phrase did not constitute prosecutorial impropriety. See *State* v. *Fauci*, 282 Conn. 23, 39–40, 917 A.2d 978 (2007) (state's use of term "red herring" in closing argument did not constitute prosecutorial impropriety because prosecutor used term only to rebut defense counsel's argument).

Furthermore, the prosecutor stated: "[Y]ou heard [A] testify that she lives kind of out in the middle of nowhere in rural Putnam, not like the downtown area of Putnam, and [*it*] *would take . . . kind of an effort to get to this particular house*, especially on a bicycle. And [there was] no evidence that the defendant had a car; the evidence is that the defendant gets around by a bicycle . . . ." (Emphasis added.) According to the defendant, the state's comment that it would have taken effort to get to A's home was not supported by the evidence introduced at trial. The state, on the other hand, argues

that this remark was permissible because it properly referred to facts in evidence and then invited the jury to draw a reasonable inference based on those facts. We agree.

"A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . The rationale for the rule prohibiting the state from making such a reference is to avoid giving the jury the impression that the state has private information, not introduced into evidence, bearing on the case." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 587, 849 A.2d 626 (2004).

At trial, A testified that she lived in a rural part of Putnam. She also testified that the defendant's primary mode of transportation was a bicycle. Accordingly, the challenged statement was supported by facts properly in evidence. Moreover, the state's assertion that it would have taken some effort for the defendant to reach A's home was a reasonable inference for it to invite the jury to draw, given that A lived in a rural area and the defendant traveled only by bicycle. Thus, because the state's remark amounted to a reasonable inference that was based on facts in evidence, it did not constitute prosecutorial impropriety. See id. Because we determine that no impropriety existed, our inquiry ends there.

The judgment is reversed with respect to the defendant's conviction of harassment in the second degree and stalking in the second degree and the case is remanded with direction to render a judgment of acquittal on those charges only and for resentencing according to law; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] Unless otherwise indicated, all references to § 53a-181d in this opinion are to the version appearing in the 2018 supplement to the General Statutes.

[2] Unless otherwise indicated, all references to § 53a-183 in this opinion are to the 2017 revision of the statute.

[3] We note at the outset that we address the defendant's claims in a different order than which he briefed them.

[4] In accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

[5] Nunchucks are "a martial arts weapon consisting of two short wooden sticks connected by a piece of chain which [can] be whirled with a circular motion and thrown . . . ." 8 American Law of Products Liability (3d Ed. Rev. 2010) § 102:24, p. 100.

[6] The defendant had stopped attending the karate school after A ended their relationship because the school's owner had asked him to take some time off from the school.

[7] Exhibit 11 is the only exhibit that detailed a posting on April 7, 2018. The exhibit contains seven pages of Facebook screenshots taken from a cell phone. Because the screenshots do not clearly set forth the chronology of the conversation, we have attempted to put the conversational posts in chronological order. The plaintiff included a copy of exhibit 11 in his appendix filed with this court.

[8] It appears that, following this Facebook post, there were various conversational posts that took place under it. The content of those posts, however, is not visible in exhibit 11 and was not otherwise provided to the jury. The posts that are set forth in this opinion are those visible in exhibit 11.

[9] The defendant was originally charged with a single count of violating a restraining order in violation of § 53a-223b. On the day that jury selection was initially scheduled to begin, the state filed an amended long form information adding seven new criminal charges against the defendant. These charges alleged different statutory violations stemming, at least in part, from acts occurring prior to April 7, 2018. The defendant filed a motion to dismiss, arguing, inter alia, that the additional charges were barred by the statute of limitations. In response, the state filed a new, three count information that removed the time barred charges.

With respect to the violation of a restraining order charge, the operative information states: "Assistant State's Attorney Andrew J. Slitt, for the Judicial District of Windham, accuses BLAIR BILLINGS (D.O.B. February 23, 1968), now or formerly of Killingly, Connecticut of CRIMINAL VIOLATION OF A RESTRAINING ORDER, and charges that on or about April 7, 2018, in the town of PUTNAM, within the judicial district of Windham, the said BLAIR BILLINGS, when a restraining order has been issued against such person, contacted and harassed a person in violation of that order, in violation of . . . § 53a-223b (a) (2)."

With respect to the stalking charge, the operative information states: "Said Assistant State's Attorney further accuses BLAIR BILLINGS of STALKING IN THE SECOND DEGREE, and charges that on or about April 7, 2018 in the town of PUTNAM, said BLAIR BILLINGS, knowingly engaged in a course of conduct by harassment on social media directed at a specific person, [A], that would cause a reasonable person to suffer emotional distress in violation of . . . § 53a-181d (b) (1)."

With respect to the harassment charge, the operative information states: "Said Assistant State's Attorney further accuses BLAIR BILLINGS of HARASSMENT IN THE SECOND DEGREE, and charges that on or about April 7, 2018 in the town of PUTNAM, said BLAIR BILLINGS, with the intent to harass, annoy, or alarm [A] he communicates with another person by social media in a manner likely to cause annoyance and alarm in violation of . . . § 53a-183 (a) (2)."

[10] It is well established that those earlier social media posts could not serve as substantive evidence of a violation of the three statutes with which the defendant was charged. See *State* v. *Randolph*, 284 Conn. 328, 340, 933 A.2d 1158 (2007) ("[a]s a general rule, evidence of prior misconduct is inadmissible to prove that a criminal defendant is guilty of the crime of which the defendant is accused" (internal quotation marks omitted)).

[11] On the charge of violation of a restraining order, the court sentenced the defendant to a period of five years of incarceration, execution suspended after nine months, followed by three years of probation. The defendant also was sentenced to ninety days of incarceration on the second degree stalking charge and sixty days of incarceration on the second degree harassment charge, with those sentences to run concurrently with the sentence for the violation of a restraining order charge.

[12] On appeal, the defendant does not claim that the court's admission of the challenged exhibits was based on an incorrect view of the law.

[13] To the extent that the defendant contends on appeal that the screenshots also should not have been admitted because they "were not in the sole custody of the witness[es], the state took no investigative acts which could have properly authenticated the evidence, and the documents were not complete," those arguments are inadequately briefed given that they were mentioned only briefly and never were analyzed in the defendant's briefs. See *C. B.* v. *S. B.*, 211 Conn. App. 628, 630, 273 A.3d 271 (2022) ("[W]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . For a reviewing court to judiciously and efficiently . . . consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs." (Internal quotation marks omitted.)).

[14] The defendant does not make this argument as to the charge of violation of a restraining order. He "acknowledges that in the light most favorable, [the] jury could have found that he talked about [A] on social media on April 7, 2018, despite not using any names, and was therefore guilty of violating the restraining order, as charged and argued to the jury."

[15] We note that the defendant's claim is unpreserved and that he seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). "The record is adequate for review, and the claim, asserting a violation of the defendant's right to freedom of speech, is of constitutional magnitude." *State* v. *Moulton*, 120 Conn. App. 330, 335, 991 A.2d 728 (2010), aff'd in part, 310 Conn. 337, 78 A.3d 55 (2013).

[16] In 2021, the legislature made substantial substantive changes to the second degree stalking statute. See Public Acts 2021, No. 21-56, § 2. The new version of the statute, effective October 1, 2021, provides in relevant part: "(b) A person is guilty of stalking in the second degree when:

"(1) Such person knowingly engages in a course of conduct directed at or concerning a specific person that would cause a reasonable person to (A) fear for such specific person's physical safety or the physical safety of a third person; (B) suffer emotional distress; or (C) fear injury to or the death of an animal owned by or in possession and control of such specific person;

"(2) Such person with intent to harass, terrorize or alarm, and for no legitimate purpose, engages in a course of conduct directed at or concerning a specific person that would cause a reasonable person to fear that such person's employment, business or career is threatened, where (A) such conduct consists of the actor telephoning to, appearing at or initiating communication or contact to such other person's place of employment or business, including electronically, through video-teleconferencing or by digital media, provided the actor was previously and clearly informed to cease such conduct, and (B) such conduct does not consist of constitutionally protected activity; or

"(3) Such person, for no legitimate purpose and with intent to harass, terrorize or alarm, by means of electronic communication, including, but not limited to, electronic or social media, discloses a specific person's personally identifiable information without consent of the person, knowing, that under the circumstances, such disclosure would cause a reasonable person to:

"(A) Fear for such person's physical safety or the physical safety of a third person; or

"(B) Suffer emotional distress." General Statutes (Supp. 2022) § 53a-181d (b).

[17] In 2021, the legislature substantially revised the elements of the offense. See Public Acts 2021, No. 21-56, § 5. Effective October 1, 2021, the statute now provides in relevant part: "(a) A person is guilty of harassment in the second degree when with intent to harass, terrorize or alarm another person, and for no legitimate purpose, such person: (1) Communicates with a person by telegraph or mail, electronically transmitting a facsimile through connection with a telephone network, electronic mail or text message or any other electronically sent message, whether by digital media account, messaging program or application, or otherwise by computer, computer service or computer network, as defined in section 53a-250, or any other form of communication, in a manner likely to cause terror, intimidation or alarm; (2) makes a telephone call or engages in any other form of communication, whether or not a conversation ensues, in a manner likely to cause terror, intimidation or alarm; or (3) communicates or shares a photograph, video or words or engages in any other form of communication to a digital, electronic, online or other meeting space, in a manner likely to cause terror, intimidation or alarm. . . ." General Statutes (Supp. 2022) § 53a-183.

[18] To the extent the state's brief can be interpreted as arguing that the defendant's posts contained in the April 7, 2018 Facebook conversation were unprotected under the speech integral to criminal conduct exception to the first amendment as it pertains to the defendant's harassment conviction, that argument fails for the same reasons as discussed in part II B of this opinion.

[19] Although not all of the defendant's claims of prosecutorial impropriety are preserved, "under settled law, a defendant who fails to preserve claims of prosecutorial [impropriety] need not seek to prevail under the specific requirements of *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test." (Internal quotation marks omitted.) *State* v. *Ortiz*, 343 Conn. 566, 579, 275 A.3d 578 (2022). Accordingly, we review all of the defendant's prosecutorial impropriety claims regardless of whether those claims were properly preserved at trial. See id.

[20] Although the state also planned to call several state troopers, the clerk of the Putnam Superior Court, and a state marshal as witnesses, the defen-

dant did not request the criminal histories or address for any of those individuals.

[21] Practice Book § 40-5 provides in relevant part: "If a party fails to comply with disclosure as required under these rules, the opposing party may move the judicial authority for an appropriate order. . . ."

_____